EDWARD E. GEORGE v. UNIVERSITY OF MINNESOTA ATHLETIC
ASSOCIATION.[1]

April 8, 1909.

Nos. 15,817—(149).

**University of Minnesota—Athletic Association.**

The University of Minnesota Athletic Association is a branch or department of the University of Minnesota, and is not a proper party defendant in an action of tort brought by a spectator injured by the collapse of the platform.

Action in the district court for Hennepin county to recover $5,000 for personal injuries caused by the collapse of a platform on which plaintiff was standing while watching a football game. The case was tried before Dickinson, J., and a jury which returned a verdict in favor of plaintiff for $2,000. From an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, it appealed. Reversed.

*Morton Barrows,* for appellant.
*Larrabee & Davies,* for respondent.

JAGGARD, J.

Plaintiff having paid admission to the football game between the University of Chicago and the University of Minnesota on November 2, 1907, was injured by the collapse of the platform on which he was standing. He brought this action for injuries then sustained. The principal question in this appeal is, whether the action was properly brought against defendant and appellant, the University of Minnesota Athletic Association, under section 4068, R. L. 1905. That section is as follows: "Actions against partnership, etc.—When two or more persons transact business as associates and under a common name, whether such name comprise the names of such persons or not, they may be sued by such common name, and the summons may be served on one or more of them. The judgment in such case shall bind the joint

[1] Reported in 120 N. W. 750.

property of all the associates, the same as though all had been named as defendants."

We are of opinion that defendant was a branch or department of the University of Minnesota, and this action, therefore, does not lie. In 1905 the board of regents of the University adopted a resolution establishing the university council, which was authorized to appoint "a committee on athletics." That council is a body composed of the deans of all the faculties, together with one member for each four hundred students or major fraction thereof, and a general representative of the alumni association. It appoints a committee of five members, all taken from the different college faculties. That athletic committee, it was provided, "shall have supervision of Northrup Field, the grandstand and seats thereon. They shall satisfy themselves of the safety of all stands before allowing them to be used." It was "given entire control of University athletics, subject to the constant revision and ratification of the university council." No students were members of this committee. There was also "an athletic board of control." By resolution of the university council in 1906 it was provided "that all proposed expenditures, after being recommended by the board of control, shall be submitted for approval to the athletic committee, and no expenditures shall be made and no debts shall be incurred without such approval." That board is composed of seven student members, elected annually on vote of the student body and the professors, two faculty members elected by the council committee of five, and two members elected by the alumni association. The two faculty members were, by virtue of their office or position upon the athletic board of control, chairman of the ticket committee and chairman of the auditing committee. The action of the board of control was, however, supervised by the council committee of five, and this in turn by the university council, and this in turn by the board of regents. No student member received any salary or compensation. Members of the association could not participate nor share in any profits or receipts derived from the exhibits given. The athletic association had no stockholders and owned no property of any kind. Northrup Field, its seats, grounds, stands, and paraphernalia for conducting athletic contests, belonged to the University. The sole source of revenue is the gate receipts from athletic exhibitions. The treasurer of the University has

always acted as the treasurer of the athletic association. He kept a separate account of these funds which were the property of the University. Any accumulations of these funds, not used for the ordinary expenses of the association, have gone to the improvement of Northrup Field; and it is proposed to use the immediate surplus for putting in swimming pools, running tracks, and other permanent improvements.

It is evident, from this statement of facts, that the board of control was a mere agency of the University. Its ultimate creator was not the students, but the regents. It owed its origin immediately to the faculty committee of five. They had the power at any time to change or abolish it. Not only did the property it used belong to the University, but also the receipts. It could contract no indebtedness and pay no bills without the approval of the faculty committee. That the student body, graduate and alumni, was given a voice, was consistent with the promotion of the distinctive purposes of the University, and in no wise tended to constitute the board of control a partnership or ordinary commercial association. The board of control resembled many organizations current in colleges and schools, whereby the authorities of the educational institution retain ultimate, absolute control, but enlist the interest, sympathy, and support of the student body by giving to members elected from it representative and limited power. Thus there are the college clubs, the title to which is in the institution, which are managed by the faculty, and yet on the house and other committees of which the students have representation. Such building is as much a part of the University as its main building. No taxes are paid upon it. Police regulations apply to it, equally and no more than to other University structures. So it often, but not always, occurs that students are given a corresponding representation in the management of military affairs in large schools. None the less the armory and other property belong to the University.

On the other hand, there are many institutions connected with the University which are purely private and subject to ordinary laws. The average college fraternity is a good example. Often it owns its own building, or rents one from private parties, which is subject to taxation as is other private property. It incurs its liabilities and is respon-

sible for them, as is any other private organization. Teachers are usually members but in a private capacity only.

In Scott v. University, 152 Mich. 684, 116 N. W. 624, 17 L. R. A. (N. S.) 234, a spectator was injured at an athletic contest by the collapse of a stand. The trial court directed a verdict for defendant. A new trial was granted. In that case, however, it was held that the "association was simply the student in another form." The regents exercised no control of the funds of the association, except that there should be a proper auditing of accounts. There was, in brief, no testimony corresponding to that presented by this record, showing that the association was a mere agency or instrumentality of the regents.

It follows that the defendant was neither a partnership, nor a corporation, nor a voluntary association of individuals transacting business. It was a branch of the University, and was not proper party defendant.

Reversed.

START, C. J. (dissenting).

I am of the opinion that the defendant is an association of individuals under a common name to promote athletics, and as an incident thereto to give exhibitions of games for profit. The fact that its membership includes students and members of the faculty of the University does not change the essential character of the association and make it a department of the University. I therefore dissent.

ELLIOTT, J.

I agree with the conclusion reached in the opinion prepared by Mr. Justice JAGGARD. If any liability exists in this case, it rests upon the University.

LEWIS, J. (dissenting).

I dissent. The majority of the court have assumed that the university council, and not the athletic association, is the body which conducts athletic games, and transacts business with the public. This is a mistake. The foundation of the entire athletic system of the University is the defendant. According to its constitution the athletic association is composed of those members of the student body and

faculty who subscribe to the constitution. Its officers consist of a president, vice president, and secretary. It has charge of the athletics at the University, viz., football, baseball, tennis, field and track athletics, and aquatic and winter sports. The duties of the officers are those generally performed by officers of similar associations. The "executive committee" is called the "board of athletic control," and it is given authority to conduct the business of the association. This board is composed of the officers of the association, two members of the faculty, to be chosen by the faculty, and two members of the alumni, to be chosen by the board of directors of the athletic alumni association. The officers of the association act as the officers of the board of control. The board of control selects a treasurer for the association, defines the duties of the various departments, authorizes the expenditure of the moneys of the association, audits the accounts of the treasurer, makes a report to the association, and has power to suspend or remove any department manager or captain. There are other articles defining the duties of the association, providing for meetings, how amendments to the constitution may be made, and adopting Robert's Rules of Order for its procedure. The by-laws regulate the meetings of the board of control, provide the committees to have charge of its exhibitions, and declare that the board of control shall authorize and approve all contracts and agreements on behalf of the association.

The "University Council" was established by the board of regents May 31, 1905. It consists of the president, the deans of the various schools, one representative from each college for each four hundred students, and one representative of the general alumni association. This council has authority to appoint the following committees: University auditing committee, committee on press athletics, on university relations to other institutions of higher learning, on health and sanitation, on commencement and other functions, on catalogue, programme and courses of study, and on entertainments and social affairs. The council was also authorized to appoint such other committees as the interests of the University might require, to receive reports of all committees, and make recommendations to the board of regents. In March, 1906, the council passed a resolution increasing its subcommittee on athletics to five, and providing that two of them

should serve on the board of control of the athletic association and be represented on the auditing committee by two members. This sub-committee of five were required to pass upon the eligibility of students to participate in athletic sports and to approve expenditures proposed to be made by the board of control. The resolution directed this committee to have supervision of Northrup Field, and to satisfy themselves of the safety of the stands; and "that the methods of administering in detail the business of the athletic association shall be subject to the approval of the athletic committee; that this committee is given entire control of university athletics, subject to the constant revision and ratification of the university council."

It is clear to me that the purpose of this athletic committee, appointed by the university council, was merely to check up and to see that the business of the athletic association was properly conducted. This was done, in part, by holding office in that association. The members of the committee were members of the association. They officiated as officers of the board of control. They possessed the power of veto in certain cases; but the university council and the athletic association were two entirely independent organizations. The business of the latter was, according to its constitution and by-laws, to conduct all athletic exhibitions. To the former was delegated the authority to see that the business was properly conducted. Such was the understanding of all the parties, according to the evidence. The athletic association made all contracts with employees and for materials necessary to accomplish the purposes of its existence. The very person who put up the defective bleacher was in the employ of the association, and had been for six or seven years. It invited the public to transact business with it, and on the occasion in question the business engaged in was within its powers defined by its constitution and by-laws, and the members of the association were associates in business, within the meaning of section 4068, R. L. 1905.

That the surplus funds, after paying the expenses of the association, were used in improving the state's property, is immaterial. The result would be the same, had the money been used in leasing grounds for that purpose, or in buying and improving its own property. That the board of regents had authority to abolish athletics entirely is of no importance in determining the question. The regents have not

deemed it proper to do so, but they have established a system of espionage over athletic sports, without attempting to engage in the business themselves.